Opinion issued January 8, 2004



     









In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00555-CR




DAVID SIDNEY HISEY, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Cause No. 01CR0556




O P I N I O N

          Appellant, David Sidney Hisey, was charged by indictment with capital murder
for intentionally or knowingly causing the death of Sunnye Hisey on or about
November 15, 1999 and for intentionally or knowingly causing the death of Hollis
Hisey on or about July 15, 2000 pursuant to the same scheme or course of conduct,
but during different transactions. A jury convicted appellant of the lesser-included
offense of murder and assessed punishment at 43 years’ confinement and a $10,000
fine.
          In his first point of error, appellant claims that the trial court erred by charging
the jury in the disjunctive, which effectively permitted conviction for the lesser-included offense of murder without a unanimous verdict. In his second point of error,
appellant claims that he was denied the opportunity to prove that the jury decided his
punishment by lot, which deprived him of a new trial pursuant to rule 21.3(c) of the
Rules of Appellate Procedure. We reverse and remand.
BACKGROUND
          Appellant lived with his parents, Sunnye and Hollis Hisey, in Galveston, Texas. 
Appellant grew up in Galveston and previously resided in Florida, but returned to the
island around 1995 to care for his elderly parents, who were suffering from declining
health. On September 1, 2000, responding to inquiries from concerned family and
friends regarding the condition and whereabouts of the elderly couple, Investigator
Bruce Balchunas and Detective Perry Larvin of the Criminal Investigation Division
of the Galveston County Sheriff’s Office met appellant at the Hisey residence. 
Appellant signed a consent form to allow the officers to search the residence. In a
bedroom, the detectives discovered the partially decomposed bodies of Sunnye and
Hollis Hisey. According to the Galveston Medical Examiner, both had been strangled
to death. Following his arrest, appellant reached for a firearm in an attempt to kill
himself, but was restrained by the police officers. While in custody, in a videotaped
statement to police officers, appellant claimed that his parents died of natural causes. 
DISCUSSION
Erroneous Jury Charge
          In his first point of error, appellant contends that the trial court erred by
permitting the jury to return a non-unanimous verdict on a lesser-included offense of
murder in the guilt-innocence jury charge. The charge to the jury instructed that
appellant should be found guilty of the lesser offense of murder if jurors found
beyond a reasonable doubt that appellant either:
          1.       intentionally or knowingly caused the death of Sunnye Hisey and Hollis
Hisey and the jury had a reasonable doubt whether the murders were
committed pursuant to the same scheme or course of conduct; OR,
 
          2.       intentionally or knowingly caused the death of Sunnye Hisey, but did
not cause the death of Hollis Hisey; OR,
 
          3.       intentionally or knowingly caused the death of Hollis Hisey, but did not
cause the death of Sunnye Hisey.

The verdict form provided the jury with three options: (1) guilty of capital murder as
alleged in the indictment; (2) guilty of the lesser offense of murder; or, (3) not guilty. 
The murder option did not specify which of the three possibilities the jury relied on
in reaching the verdict, namely, whether appellant was guilty of murdering both
parents, his mother only, or his father only.
          The Court of Criminal Appeals addressed the issue of disjunctive jury charges
in Francis v. State, 36 S.W.3d 121 (Tex. Crim. App. 2000). In Francis, the appellant
was charged with a single count of indecency with a child. Id. at 122. The State’s
evidence, however, established two incidents in which Francis touched the victim’s
breasts and two incidents in which he touched the victim’s genitals, but no incidents
in which he touched the victim’s breasts and genitals. Id. (emphasis added). The jury
charge in Francis contained the following language:
[I]f you find from the evidence beyond a reasonable doubt . . . the Defendant
. . . did, engage in sexual contact by touching the breast or genitals of . . . .

Id. at 124 (emphasis in original). Francis objected to the language “breasts or
genitals” and requested the charge read “breasts and genitals.” Id. at 123 (emphasis
in original).
          The Court of Criminal Appeals held that the Francis trial court erred by
charging the jury in the disjunctive. Id at 125. The disjunctive charge made it
possible for Francis to be convicted by a non-unanimous jury because the charge
allowed the jury to convict him even if some of the jurors believed he touched only
the victim’s breasts while others believed he touched only the victim’s genitals. Id. 
This possibility made it impossible for the reviewing court to ascertain for which
offense of indecency with a child the jury had found Francis guilty. Id. The failure
of the Francis trial court to require a unanimous jury finding of guilt resulted in a
remand for a harm analysis. Id.
          As in Francis, the jury charge in this case allowed the jury to convict appellant
of murder whether some members of the jury believed appellant was guilty of
murdering both his parents, or whether some jurors believed he murdered solely his
mother or solely his father. See id. The murder of Sunnye Hisey is one offense, and
the murder of Hollis Hisey is a different offense. Yet, the charge allowed for
conviction of murder if appellant committed either offense and thereby allowed for
the possibility of a non-unanimous jury verdict of murder. It is impossible for us to
ascertain for which offense the jury convicted appellant. Although it is entirely
possible that some of the jurors may have believed appellant was guilty of the murder
of both his parents, it is also possible that appellant was convicted of murder by six
jurors who believed he was guilty of murdering only his mother and six jurors who
believed he was guilty of murdering only his father. As written, the charge allowed
for a non-unanimous jury verdict, in violation of the Texas Constitution’s and Texas
Code of Criminal Procedure’s requirements of a unanimous jury verdict in felony
cases. See Francis, 36 S.W.3d at 125; Tex. Const. art. V § 13; Tex. Crim. Proc.
Code. Ann. §36.29(a) (Vernon Supp. 2004). We conclude that the trial court erred
by not requiring the jury to return a unanimous verdict as to one of the three theories
of committing the lesser-included offense of murder.
Harm Analysis
          Having found error in the jury charge, we must now determine whether the
error was harmful enough to require reversal. See Abdnor v. State, 871 S.W.2d 726,
731-32 (Tex. Crim. App. 1994). The degree of harm required for reversal turns on
whether appellant preserved error in the trial court. See id. at 732. An appellant who
timely objects to the charge preserves error for review, and reversal is required only
on the finding of “some harm.” Id. at 732. The burden is higher if an appellant did
not object to the charge. When an appellant does not preserve error, we may not
reverse unless appellant suffered “egregious harm.” Id. 
          When an appellant has failed to object to an erroneous disjunctive jury charge,
an appellate court applies the Almanza egregious-harm standard, which requires
reversal only if the error was so harmful as to deprive the appellant of a fair and
impartial trial. See Clear v. State, 76 S.W.3d 622, 623-24 (Tex. App.—Corpus
Christi 2002, no pet.) (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1985)). To assess the degree of harm, we examine the following: (1) the entire jury
charge; (2) the state of the evidence, including contested issues and the weight of the
probative evidence; (3) the arguments of counsel; and (4) any other relevant
information revealed by the record of the trial as a whole. Almanza, 686 S.W.2d at
171. Errors that result in egregious harm are those that affect “the very basis of the
case,” “deprive the defendant of a valuable right,” or “vitally affect a defensive
theory.” Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing Almanza
686 S.W.2d at 172). An appellate court must examine the relevant portions of the
entire record to determine whether appellant suffered any actual harm as a result of
the error. Arline v. State, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). It is the
appellant’s burden to prove that he suffered some actual, rather than merely
theoretical, harm from the error. Dickey v. State, 22 S.W.3d 490, 492 (Tex. Crim.
App. 1999) (citing Arline v. State, 721 S.W.2d at 351). 
          Appellant did not object to the jury charge; thus, reversal is required only if the
error was so harmful as to deprive him of a fair and impartial trial. See Almanza, 686
S.W.2d at 172. The State contends that appellant did not suffer actual, egregious
harm as a result of the disjunctive charge because the charge required the jury to
agree unanimously upon one of the three lesser-included offenses of murder. We
disagree. The charge did not specify that the 12 jurors had to be unanimous in their
theory of the murder, but instead allowed for a conviction for murder even if jurors
disagreed about which murder appellant committed. 
          The State further asserts that because the overwhelming weight of the evidence
established that appellant was guilty of killing both his mother and father, he has
suffered no actual harm as a result of the erroneous charge. We address the State’s
contention by applying an Almanza harm analysis to evaluate the degree of actual
harm caused by the erroneous disjunctive jury charge. 686 S.W.2d at 172. 
          1. The Jury Charge
          We begin our harm analysis by analyzing the jury charge itself. See Almanza,
686 S.W.2d at 171. The jury charge instructed the jury to find appellant guilty of
capital murder if the evidence established beyond a reasonable doubt that he
intentionally or knowingly caused the death of Sunnye Hisey and Hollis Hisey
pursuant to the same scheme or course of conduct, but during different transactions. 
There were two differences between the jury charge for capital murder and the charge
for the lesser offense of murder. First, the murder charge did not require the jury to
find that the deaths were caused pursuant to the same scheme or course of conduct. 
Second, the erroneous murder charge allowed for a conviction if the proof established
that appellant caused the death of either his mother or his father or both, unlike the
capital murder charge, which required a finding that appellant caused both deaths. 
          We know from the jury verdict convicting appellant of murder that the jury
believed appellant caused the death of at least one of his parents. We also know from
the verdict that the jury either had a reasonable doubt concerning whether the deaths
occurred during the same scheme or course of conduct, or whether appellant caused
both Hiseys’ deaths. 
          In assessing whether appellant was harmed by the erroneous jury charge, we
also consider the appellate presumption that the jury is presumed to have understood
and followed the court’s charge, absent evidence to the contrary. See Hutch, 922
S.W.2d at 172. Under this presumption, we must presume that the jury followed the
erroneous instruction, which authorized conviction for murder, even if the jurors
disagreed whether appellant killed only Sunnye or only Hollis, as long as they
unanimously agreed he killed either or both of them. See id. Moreover, the
erroneous charge was contained in the application paragraph, the portion of the
charge that authorizes the jury to act. See id. Nothing in the record suggests that the
jury did not understand or follow the court’s charge, and we must presume that it is
possible that appellant was convicted by a jury that may have been split concerning
whether he killed either Sunnye or Hollis. See id.
          2. The Contested Issues
          We must next examine the state of the evidence, including contested issues and
the weight of the probative evidence. See Almanza, 686 S.W.2d at 171. There were
two contested issues in the trial. First, the parties contested whether the deaths
occurred during the same scheme or course of conduct. Second, the parties contested
whether appellant caused the deaths of both Sunnye and Hollis.
          The State’s theory that the murders occurred pursuant to the same scheme or
course of conduct revolved around evidence that established that appellant stole
approximately half a million dollars from his parents. According to the State, from
1995, when appellant began to assume the care of his elderly parents, until 1999, just
before the death of his mother, appellant depleted the Hiseys’ bank accounts. 
According to the State, appellant killed his mother in late 1999, because she was no
longer of use to him and too difficult to care for, and killed his father at least eight
months later, in mid-2000, for the same reasons. When friends or family members
attempted to speak to the Hiseys, appellant would lie about their whereabouts. 
Additionally, appellant would borrow money from the Hiseys’ friends and family
under the guise that the Hiseys needed funds to pay their bills. 
          Appellant did not testify, but he did establish a defense from cross-examination
of the State’s witnesses and through defense witness testimony. Appellant did not
dispute the evidence establishing that he was a thief and a liar, but nonetheless
contended that there was no financial motive to kill his parents pursuant to any
scheme or course of conduct. Appellant points to evidence that he had a power of
attorney to handle the financial affairs of his father since 1999, and that he had
already depleted the Hiseys’ bank accounts by early 1999, before the death of either
of the Hiseys. Moreover, appellant maintains that, if the motive were financial, there
would be no reason for at least an eight-month gap between the death of Sunnye and
the death of Hollis. 
          The parties disagreed about why appellant did not bury his parents’ bodies in
a traditional manner. According to the State, appellant had to hide the bodies in order
to maintain the appearance that the Hiseys were still alive so that he could continue
to receive his mother’s monthly social security checks and his father’s bi-monthly
retirement checks after their deaths. Appellant denied the financial motive for failing
to bury his parents traditionally. He presented evidence of the Hisey “family plan”
through Dr. Theodore Stubbs, a retired cardiologist. According to Dr. Stubbs, when
he and appellant were friends in the ninth grade, appellant told him his “family plan”
was to care for his parents, and, upon their deaths, to allow the deceased parents to
remain in a bedroom rather than to provide for a traditional burial. 
          The parties also disagreed about the interpretation of appellant’s attempted
suicide. Although the State maintained that appellant’s attempted suicide showed
guilt over the killing of his parents, appellant maintained that the suicide could be
related to his feelings of guilt about the thefts.
          The evidence in the record reflects a dispute between the parties concerning
whether the deaths were caused pursuant to the same scheme or course of conduct. 
Although evidence of the theft, evidence of the lies to the Hiseys’ friends, family,
social worker, and persons involved with Meals on Wheels, and evidence about the
hiding of the bodies was not disputed by appellant, the interpretation of the evidence
was hotly contested and subject to credibility assessments by the jury. The jury’s note
to the trial court during its deliberations, stating that it had a dispute about the
meaning of the terms “course of conduct” and “same scheme,” reflects that the jury
was concerned with the issue. Because we cannot make the necessary credibility
assessments from a cold record, we cannot determine whether the dispute concerning
the issue of same scheme or course of conduct resulted in the acquittal of capital
murder.
          The second major area disputed by the parties concerned the issue of cause of
death for Sunnye and Hollis. Because the jury convicted appellant of murder, we
know that the jury was convinced beyond a reasonable doubt that he caused the death
of Sunnye or Hollis. Because of the erroneous instruction in the charge, however, we
do not know whether the jury was convinced that appellant killed both Hiseys, or
whether it believed he killed only one of the Hiseys, and, if so, which one. 
          We review the medical evidence from the experts, three for the State and one
for the appellant, to attempt to determine what the evidence established as the cause
of death for Sunnye and Hollis. Dr. Charles Harvey, the Galveston County Medical
Examiner, performed the autopsies on the bodies of Sunnye and Hollis. Dr. Stephen
Pustilinik, the Deputy Chief Galveston County Medical Examiner, and Dr. Sparks
Veasey, an Assistant Galveston County Medical Examiner, did not assist in the
autopsy, but personally examined the neck organs taken from the bodies of the Hiseys
after the organs were placed into a formalin solution. Appellant’s expert, Dr. Lloyd
White, a medical examiner in Nueces County, also examined the Hiseys’ organs that
were in the formalin solution and reviewed the autopsy report prepared by Dr.
Harvey.
          Much of the medical testimony was not contested. Sunnye was 85 years and
Hollis was 91 years of age at the time of their deaths. Having been dead almost a
year, Sunnye was in a decomposed state of mummification at the time of autopsy. 
Having been dead for two to four months, Hollis was in an advanced decomposed
state at the time of autopsy. The doctors agreed that the state of decomposition and
the circumstances in which the bodies were found made the evaluation of the case
difficult. Because of the state of decomposition, the external examination of Sunnye
and Hollis at the time of the autopsy did not reveal signs of strangulation, such as
visible marks on the neck or hemorrhages in the eyes.
          There was no dispute among the experts concerning the many serious ailments
that plagued Sunnye and Hollis. Sunnye had atherosclerosis, clinical hypertension,
and Alzheimers disease at the time of her death. Hollis had chronic obstructive
pulmonary disease, atherosclerotic coronary artery disease, with up to an 80 percent
arterial blockage at the time of his death, pyelonephritis, and Alzheimers disease.
          Although the opposing experts could agree on many of the medical findings,
they could not agree about the cause of death. The State’s three experts, Dr. Harvey,
Dr. Pustilinik, and Dr. Veasey, each testified that the Hiseys were without a doubt
killed by strangulation. The cause of death was described as obvious by the State’s
experts, but the appellant’s expert, Dr. Lloyd White, testified that the cause of death
for both Hiseys was most likely natural causes. According to Dr. White, Sunnye and
Hollis died of atherosclerotic coronary artery disease contributing with the kidney
infection and the lung disease. Although Dr. White admitted the circumstances of the
deaths were suspicious, he noted that sometimes people leave their parents or their
spouses in their homes after death simply for psychological reasons.
          The medical evidence necessary to conclude that death was caused by
strangulation appears to be an issue that was of concern to the jury during its
deliberations. The jury sent a note stating, “There is a dispute on Dr. White’s
testimony as to reasons he would have to observe in order to rule strangulation in
elderly/fresh bodies.” In response, the trial court had the court reporter read back Dr.
White’s answer:
“I would like to see a ligature around the neck if the body is severely
decomposed. If the body isn’t severely decomposed, I look for the kind
of things that actually Dr. Harvey has quite aptly described. I look for
marks on the skin. I look for hemorrhages in the muscle and soft tissue. 
I would look for fractures of the larynx of the hyoid bone. I would look
for ingestion of the face and small petechial hemorrhages of the face and
mucous membranes.”

None of the signs of strangulation mentioned by Dr. White were present in the
Hiseys’ bodies, with the exception of fractures and hemorrhages described by the
State’s experts.



          The medical dispute concerned the fractures and hemorrhages discovered
during the internal autopsy examination. The State’s doctors testified that the Hiseys
each had three fractures to their neck area caused by strangulation. However,
appellant’s expert contended that the findings of fractures to Hollis’s neck could have
been caused by the manipulation of the duct tape that was wrapped around his head. 
Hollis’s body arrived at the morgue wrapped in two sheets, plastic casing, and duct
tape. Appellant’s expert challenged the findings of fractures on Sunnye by pointing
to the original autopsy report which contained Dr. Harvey’s conclusions that there
were no fractures seen on Sunnye’s larynx, a finding Dr. Harvey later amended to
include mention of the fractures. In reply, the State contended that it would be highly
improbable for three artifacts, fractures caused by manipulation of the bones during
autopsy, to occur to two persons’ necks who were recovered dead at the same
location.
          The jury appeared to be concerned with the issue of the possibility of artifacts
caused by the removal of the organs during autopsy. The jury’s note to the trial court
during their deliberations stated, “There is a dispute as to the presence of Dr. Harvey
during the initial removal of the voicebox and surrounding anatomy.” In response to
the note, the trial court allowed the court reporter to read back testimony from Dr.
Harvey, who testified that he was substantially, but not absolutely, certain that he
removed the organs of Sunnye and Hollis. Dr. Harvey admitted, however, that it
could have been a morgue assistant who actually removed the organs.
          The experts also disagreed about the interpretation of the evidence concerning
hemorrhages in the neck area. During the autopsies, Dr. Harvey did not see any
hemorrhages on either body, but did find mild hemoglobin staining surrounding
Hollis’s neck organs. Due to their decomposed state, Dr. Harvey had to re-hydrate
the organs in the neck area of Hollis and Sunnye by placing the organs into a formalin
solution to make the hemorrhages visible. About two days after the organs were
placed into the formalin solution, Dr. Harvey and Dr. Veasey, each observed
hemorrhages in the organs in the solution.
          According to appellant’s expert, however, it could not be said with reasonable
medical certainty that the bodies of Hollis or Sunnye had hemorrhages, as opposed
to discoloration due to decomposition. Moreover, according to appellant’s expert, the
re-hydration would not have caused a hemorrhage to appear that was not there
previously. The State’s experts, however, in rebuttal, disagreed by asserting that
medical examiners routinely distinguish between hemorrhages during life versus
death, even in decomposed bodies.
          Every expert gave a different opinion about the significance of the
disappearance of the “hemorrhage” in deciding whether there actually was a
hemorrhage. According to Dr. Harvey, once the hemorrhages became visible, they
only appeared temporarily for about two weeks, and he did not photograph or
otherwise preserve them for future examinations. According to Dr. White, if the
hemorrhages had been placed into a formalin solution, they should have remained
preserved for his examination, which occurred approximately 10 months following
the autopsies. Dr. Veasey explained that if the sample had been properly preserved,
the hemorrhage would remain, but might have become discolored. However, Dr.
Pustilinik testified that, “There is a limited time to view hemorrhage but not a limited
time to view hemoglobin staining. If it was a true hemorrhage it should have
remained in the formalin solution beyond a few days.”
          The State’s experts disagreed about the importance of the hemorrhages in
evaluating the fractures, and in reaching the ultimate conclusion of strangulation. All
the experts agreed that “putrefaction of soft tissues may produce areas of
discoloration that closely resemble hemorrhage, and in such cases the presence of
laryngeal fractures assumes vital importance and any possibility of artifactual
fractures must be eliminated.” Moreover, Dr. Veasey agreed that reasonable minds
could differ concerning findings of hemorrhage in decomposed bodies—“one might
say discoloration and one might say hemorrhage.” Dr. Harvey also testified that he
would not have expected hemorrhages to tissues if the fractures were artifacts. 
However, Dr. Veasey said that even without the hemorrhages, he would have ruled
the cause of death as strangulation because of the fractures.
           Appellant also made specific challenges to Sunnye’s cause of death as
strangulation. The doctors agreed that sphincter incontinence is quite common in
strangulation victims. However, the evidence established that Sunnye’s adult diaper
was not soiled, even though she had contents in her stomach at the time of autopsy.
          An evaluation of the medical evidence presented turns on a credibility
assessment of the physicians, all of whom appear qualified from the cold record. The
disputed testimony from the record establishes that the jury could have believed that
the fractures were really artifacts caused at the morgue, as suggested by the absence
of documentation of fractures in Sunnye’s original autopsy report, or caused by the
wrapping of Hollis’s body. The jury could have believed that there were no
hemorrhages, hemorrhages only on Hollis because he had mild hemoglobin staining
initially and Sunnye did not, or that evidence of hemorrhages was unnecessary
because of the fractures. Sunnye’s adult diaper was soil-free, inconsistent with what
is common in strangulation. There are too many variables, based on whom the jury
found credible and how it evaluated the importance of the testimony, for us to
conclude that the jury convicted appellant for both murders. From the medical
evidence, it appears possible that one or more of the jurors believed appellant killed
Sunnye only, and one or more of the jurors believed he killed Hollis only, and
reached a verdict of murder under the erroneous charge.
          3. Closing Arguments 
          We next examine the arguments of counsel. See Almanza, 686 S.W.2d at 171.
The closing arguments of the parties focused on their repeated themes in the trial. 
The State urged that appellant killed his parents when they became too difficult to
care for and hid their bodies to maintain the appearance that they were still alive so
that he could continue to steal their money. Appellant’s guilt was self-evident by his
suicide attempt following his arrest, according to the State.
          Appellant urged that it would be unnecessary for him to kill his parents to steal
from them because he had already depleted their bank accounts before their deaths. 
Moreover, appellant maintained that the Hiseys were elderly and very ill, that they
passed away from natural causes, and, in accordance with the Hisey “family plan”
established decades before their deaths, that they were kept in the Hisey home
following their deaths.
          The closing arguments do not provide any additional data to affect our decision
concerning whether appellant was harmed by the erroneous jury charge.
          4. Other information 
          Lastly, we address any other relevant information revealed by the record of the
trial as a whole. See Almanza, 686 S.W.2d at 171. The jury deliberated slightly over
seven hours before reaching a verdict and sent the three notes described above. The
record reveals no other relevant information to assist us concerning our harm
analysis.
CONCLUSION
          We reject the State’s assertion that appellant has suffered no harm because the
overwhelming weight of the evidence established he was guilty of killing both his
mother and father. Given the time period of at least eight months between the deaths
of appellant’s parents, the conflicting medical evidence between the State’s and
appellant’s experts, the conflicting evidence establishing the reasons for the seclusion
of the deceased parents in the bedroom, and the impossibility of a determination of
which murder appellant was convicted of committing, we conclude that appellant
suffered egregious harm by the court’s charge, which allowed for conviction of
murder based on a non-unanimous jury verdict. We cannot make the necessary
credibility determinations from the cold record. After examining the entire jury
charge, the jury verdict, the disputed and undisputed evidence, the weight of the
probative issues, and the arguments of counsel, we conclude that the erroneous
disjunctive charge deprived the appellant of a fair and impartial trial. See Almanza
v. State, 686 S.W.2d at 172.
          The right to a trial by jury in criminal matters is among those fundamental
rights guaranteed by our Constitutions. Hutch, 922 S.W.2d. at 174. Appellant was
effectively deprived of his right to a trial by jury because the erroneous disjunctive
jury charge allowed for a conviction of murder whether the jury believed appellant
committed the murder of Sunnye or the murder of Hollis. See Francis, 36 S.W.3d at
125; Hutch, 922 S.W.2d at 171.
          We sustain appellant’s first issue. Because of our decision on the first issue,
we need not address appellant’s second issue.
          We reverse the judgment of the trial court and remand for a new trial.
 
 
                                                             Elsa Alcala                                                                                                        Justice


Panel consists of Chief Justice Radack and Justices Keyes and Alcala.

Publish. Tex. R. App. P. 47.2(b)